## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| **DAVID P. MILLER and** | : | **Chapter 7** |
| **RANDI M. MILLER,** | : | |
| | : | **Bky. No. 08-13711ELF** |
| Debtor(s) | : | |
| | : | |
| **RANDI M. MILLER,** | : | |
| | : | |
| Plaintiff(s) | : | |
| | : | |
| v. | : | |
| | : | |
| **SALLIE MAE, INC.** | : | |
| **on behalf of the State of NJ** | : | |
| **Higher Education Assistance Authority** | : | |
| | : | |
| Defendant(s) | : | **Adv. No. 08-00164ELF** |
| | : | |

# O P I N I O N

## I. INTRODUCTION

Before the court are cross motions for summary judgment in an adversary proceeding initiated by Plaintiff Randi M. Miller ("the Debtor") to determine whether her student loan obligation to Defendant Sallie Mae, Inc. ("Sallie Mae") is dischargeable under 11 U.S.C. §523(a)(8).

Pursuant to §523(a)(8), student loan debt is dischargeable only if repayment of the debt would impose an "undue hardship" on the debtor and the debtor's dependents. In our Circuit, the Court of Appeals has adopted the three-pronged test for "undue hardship" that the Second Circuit formulated in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987). See In re Faish, 72 F.3d 298, 306 (3d Cir. 1995). The Brunner test requires a debtor

seeking to discharge his or her student loans to prove that:

> (1)   based on current income and expenses, the debtor cannot maintain a"minimal" standard of living for herself and her dependents if forced to repay the loans;

> (2)   additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and

> (3)   the debtor has made a good faith effort to repay the loans.

Id. at 304-05 (quoting Brunner, 831 F.2d at 396).

For the reasons set forth below, I conclude that the Debtor has failed to raise a material issue of disputed fact with respect to the "first prong" of the Brunner test for dischargeability under §523(a)(8).  More specifically, the Debtor has failed to raise a genuine issue for trial demonstrating that she could not maintain a minimal standard of living if she were required to repay her student loan obligation of $122.68 per month. Therefore, Sallie Mae is entitled to summary judgment.[1]


## II.  PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A.  Procedural History

On June 5, 2008, the Debtor and her husband, David P. Miller (collectively, "the Debtors"), filed a voluntary petition under chapter 7 of the Bankruptcy Code.  (Bky. Docket Entry No. 1).  On July 10, 2008, the Debtor instituted this adversary proceeding by filing a

---

[1]      Some of the reasoning regarding the first prong of the Brunner test, set out below, also leads me to conclude that the Debtor has not raised a genuine issue for trial with respect to the second prong of the test.  While this conclusion is entirely derivative, it provides an independent basis for granting Sallie Mae's motion for summary judgment.  See Part V.E.2., infra.

complaint seeking a ruling that her student loan debt to Sallie Mae is dischargeable pursuant to

the "undue hardship" standard of 11 U.S.C. §523(a)(8).  (Compl. ¶13, Adv. Docket Entry No.

1).[2]  On September 4, 2008, Sallie Mae submitted an Answer denying the Debtor's entitlement to

a student loan discharge.  (Answer, Adv. Docket Entry No. 6).[3]

On February 16, 2009, Sallie Mae and the Debtor each filed motions for summary

judgment ("the Debtor's Motion" and "Sallie Mae's Motion", respectively).  (Adv. Docket Nos.

27, 29).  The parties submitted briefs, affidavits and a joint statement of stipulated facts

("Stipulated Facts") (Adv. Docket Entry No. 29-4).  Oral argument was held on April 27, 2009.

The parties' respective motions are now ripe for disposition.


**B.  Statement of Facts**

The material facts are not in dispute.

The Debtor is 48 years old and disabled.  (Stipulated Facts ¶¶ 4, 8).  The Debtor asserts

that she suffers from "severe physical and mental disabilities", which include Arnold Chiari (a

condition involving malformation of the brain), Bipolar Disorder, Attention Deficit Hyperactive

Disorder, migraine headaches, diabetes and possible multiple sclerosis.  (Debtor's Mem. in

Support of Debtor's Motion, at 2; see also Physicians Aff. at Ex. A-C).

---

[2]      While the Debtor initially filed her complaint naming only Sallie Mae as a defendant
(Adv. Docket Entry No. 1), the parties subsequently filed a joint stipulation to change the caption of the
adversary case to reflect that Sallie Mae is acting on behalf of the New Jersey Higher Education
Assistance Authority.  (See Adv. Docket Entry No. 18).

[3]      On September 10, 2008, the Debtor and her husband received a chapter 7 discharge of
their dischargeable debts.  (Bky. Docket Entry No. 20).

According to her treating physicians, the Debtor's psychiatric difficulties, in particular, have been a continuing source of difficulty.  (See Exs. A-C to Debtor's Motion).  The Debtor has been in psychotherapy for the past 11 years.  She has been hospitalized seven (7) times.[4]  She is currently taking eight (8) different psychoactive medications to manage her psychiatric condition.  (Id.).  Nonetheless, she continues to experience serious limitations.  Most notably for the purposes of the pending cross motions, the Debtor's attempts to return to work in the past few years have been uniformly unsuccessful, resulting in serious flare ups of her condition and an inability to work for more than a few days.  (See Ex. A to Debtor's Motion).  The parties have stipulated that the Debtor will be unable to obtain meaningful employment for the rest of her life.  (Stipulated Facts ¶8).

The Debtor is married and lives with her husband and two daughters in Delaware County, Pennsylvania.  (Id. ¶¶4, 13).  At the time the summary judgment motions were filed, the couple's daughters were 7 and 20 years old.  (Id. ¶ 5 & Sch. I).[5]  The Debtors' older daughter commutes to college and works outside the home (Stipulated Facts ¶5), although the record does not reflect where she works, the amount of her income or whether she contributes any of that income to household expenses.  The Debtors also have a son who does not reside with them.

---

[4]    The Debtor's hospitalizations have been for four (4) to six (6) week durations.  (See Ex. A to Debtor's Motion).

[5]    The parties stipulated that Debtor's petition and schedules are admissible and that the facts set forth therein are true and correct as of the petition date (unless specifically agreed otherwise in the Stipulated Facts), subject to one exception:  the Debtor under-reported her medical expenses in Schedule J.  (See Stipulated Facts ¶1).  The parties also stipulated that all documents exchanged in discovery are admissible.  (Id. ¶16).

4

The Debtor's husband is employed as a produce clerk at Giant Markets. He earns an average of $3,257.00 per month before taxes, which is an annual pre-tax income of approximately $39,000.00. (Sch. I). His net monthly take home pay, after deductions are made for insurance, social security and taxes, is $2,572.00. (Sch. I). The Debtor receives Social Security Disability income of $846.00 per month. (Id.). By virtue of her mother's disability, the Debtor's younger daughter also receives a monthly Social Security benefit of $471.00. (Id.). Combined, the Miller household has $3,889.00 in average monthly income (after withholding taxes and payroll deductions). (Id.).

Federal income tax refunds provide an additional resource for the Millers.[6] Between 2005 and 2007, the Debtors received, on average, a $2,861.00 federal tax refund each year. (Stipulated Facts ¶16 & Ex. B to Sallie Mae's Motion).[7] If the Millers were to receive the same refund this year as in the past three (3) years,[8] this would put their yearly pre-tax income at more than $57,000.00.[9]

---

[6]     The Debtor produced the Millers' tax returns in discovery. (See Ex. B to Sallie Mae's Motion).

[7]     The Debtors' tax returns for 2005, 2006 and 2007 reflect a requested refund of $2,890.00, $2,700.00 and $2,995.00, respectively. (See Ex. B to Sallie Mae's Motion). The Debtor does not dispute that the Millers received refunds in those amounts.

[8]     Sallie Mae contends that the Debtors are on track to receive a tax refund of as much as $3,300.00 for 2008 (see Sallie Mae's Mem. in Support of Sallie Mae's Motion, at 3 n.1) while the Debtor contends that the refund might be lower because the Millers' medical expenses for 2008 were lower (see Debtor's Aff. ¶10, Adv. Docket Entry No. 32-2). The evidentiary record is not sufficiently developed to support a factual finding to resolve this dispute.

[9]     I derived this amount by adding the Debtor's husband's annual gross pre-tax income (approximately $39,000.00), the Debtor's annualized Social Security benefit (more than $10,000.00), the

5

The Millers live in a five (5) bedroom, three (3) bathroom home with a livable area of 2,956 square feet located at 300 Scheivert Avenue in Aston, Pennsylvania ("the Home"). (Stipulated Facts ¶4; Bankruptcy Petition, Bky. Docket Entry No. 1). The Debtors own the Home jointly, which they value at $280,000.00. (Stipulated Facts ¶ 4; Sch. A). The Debtors have two mortgages on the Home. As of the petition date, the Debtors reported owing $226,864.00 on the first mortgage, held by CitiMortgage, and $46,883.00 on the second mortgage, held by Commerce Bank. (Sch. D). As of February 12, 2009, the Debtors were at least two (2) months in arrears on their mortgage payments. (Debtor's Aff. ¶13, Adv. Docket Entry No. 27-11). Additionally, since filing their petition, the Debtors have had to cash out a mutual fund worth approximately $6,200.00 to pay real estate taxes on the Home. (Stipulated Facts ¶15).

The Millers currently own two (2) automobiles: a 2002 GMC Sierra and a 1994 Oldsmobile Cutlass. (Sch. B).[10] The Cutlass is used exclusively by the Millers' older daughter. (Stipulated Facts ¶5). The Debtors pay $181.00 a month in car insurance premiums. (Stipulated Facts ¶7.e.; Ex. E to Sallie Mae's Motion). Of that amount, $111.00 a month is paid to insure the Cutlass for their older daughter. (Stipulated Facts ¶16; Ex. E to Sallie Mae's Motion).[11] The

_____

Debtor's daughter's annualized Social Security benefit (approximately $5,600.00), and the average amount of the income tax refund received in the last three (3) years ($2,861.00).

[10]     At the time they filed their bankruptcy petition, the Debtors were also leasing a 2007 Pontiac G6. (Sch. B). They surrendered that car on July 10, 2008 and stopped paying $169.00 a month for its lease. (Stipulated Facts ¶7.f).

[11]     The parties stipulated that the Debtors paid $55.00, rather than $111.00, a month, to insure the Cutlass for their daughter's use. (See Stipulated Facts ¶7.e). Ordinarily, I would treat the stipulated fact as conclusive. However, Sallie Mae attached to its Motion the State Farm bill that reflects the breakdown in insurance costs the Debtors pay for each of their two (2) cars and the parties have also stipulated that the documents they produced in discovery should be treated as admissible at trial. See n.5,

Debtors have also opted to pay for auto insurance that includes the "full tort" option. (Stipulated Facts ¶6).

Not including the Debtor's student loan obligation to Sallie Mae, the Millers' monthly household expenses include the following:

| Expense | Amount[12] |
|---|---|
| First mortgage payment | $ 1,347.99 |
| Second mortgage payment | $ 449.55 |
| Electric and fuel | $ 317.00[13] |
| Water and sewer | $ 100.00 |
| Cable | $ 45.95[14] |
| High Speed Internet | $ 33.00[15] |
| Telephone | $ 71.05[16] |

---

supra. The State Farm bill requires the Debtors to pay $667.23 every six (6) months for automobile insurance for the Oldsmobile, or $111.00 a month annually. (See Ex. E to Sallie Mae's Motion). Because it seems more likely that disparity between Stipulated Facts and the State Farm bill is a mistake rather than a negotiated compromise (probably because counsel made an arithmetic error in the Stipulated Facts by calculating the monthly expense based on the semi-annual, instead of the annual, insurance payment), I will accept the veracity of the document over the Stipulated Fact.

[12]    Unless otherwise indicated, Schedule J is the source of the expense amounts set forth in table.

[13]    (Stipulated Facts ¶7.a).

[14]    (Stipulated Facts ¶7.b). The family's cable package includes "digital" cable with the digital video recording ("DVR") option. (Id.).

[15]    (Id.).

[16]    The Millers subscribe to a $150.00 package that includes high-speed internet, cable and telephone. The parties stipulated to the amount attributed to cable and internet. I infer the remainder is attributed to telephone.

| | | |
|---|---|---|
| Home maintenance | $ | 50.00[17] |
| Food | $ | 300.00 |
| Clothing | $ | 75.00 |
| Medical expenses | $ | 402.00[18] |
| Transportation | $ | 150.00 |
| Recreation | $ | 20.00 |
| Homeowner's insurance | $ | 90.00 |
| Life insurance | $ | 87.00[19] |
| Auto insurance | $ | 181.00[20] |
| Real estate taxes | $ | 375.00 |
| **TOTAL** | **$4,094.54** | |

As of the petition date, the Debtor owed Sallie Mae $20,624.00.[21]  The Debtor incurred

---

[17]   (Id. ¶7.c).

[18]   The parties have stipulated that: "[t]he debtor's medical expenses have increased to a minimum of $402.00 per month from $100 a month to pay for $247 per month for medication, and at least $155.00 to see two doctors and a therapist.  The debtor's family's medical expenses for 2008 were at least $6,496.00."  (Id. ¶7.d).

The Stipulated Facts refer to an "increase" in medical expenses because the stipulated amount of $402.00 is greater than the $100.00 per month the Debtor originally listed in Schedule I.  Even at $402.00 per month, the Debtor's stipulated monthly medical expenses represent a "decrease" of more than $1,600.00 annually (or more than $130.00 per month) from the expenses incurred in 2008.   The record does not disclose the reason for this decrease.

[19]   (See Ex. J to Debtor's Motion).  Of this total amount, $8.33 a month is attributable to the Debtor's life insurance policy and $78.67 a month is attributed to life insurance policy on her husband. (See Debtor's Aff. ¶¶ 11, 12, Adv. Docket Entry No. 32-2).

[20]   (Stipulated Facts ¶7.e; Ex. E to Sallie Mae's Motion).

[21]   (Stipulated Facts ¶12).

In addition to student loan debt, the Debtor and her husband scheduled approximately $64,000.00 in unsecured credit card, cellular telephone and automobile leasing debt and slightly less than $1,000.00 in medical expenses.  (See Am. Sch. F, Bky. Docket Entry No. 17).

8

this obligation as a result of Parent Plus loans she obtained to help fund her son's and older

daughter's college educations.  (Stipulated Facts ¶10; Debtor's Aff. ¶4, Adv. Docket Entry No.

27-11).  Her husband is not an obligor on the loans.  The Debtor was disabled, unemployed and

collecting Social Security Disability when she obtained these loans.  (Stipulated Facts ¶9).  In

2004, and again in 2007, the Debtor consolidated her outstanding loans to lower the monthly

payments.  (Id. ¶10).

The Debtor was current on her student loans when she filed for bankruptcy.  (Id. ¶11).

Her monthly payment is $122.68.  (Id. ¶10).


### III.  DISCHARGEABILITY UNDER 11 U.S.C. §523(a)(8)

**A.  Statutory Authority Governing the Discharge of Student Loans**

Congress has expressly excluded certain educational loans from the general bankruptcy

discharge.  The student loans the Debtor seeks to discharge are governed by 11 U.S.C.

§523(a)(8), which provides:

> (a) A discharge under section 727 . . . of this title does not discharge an
> individual debtor from any debt --
>
> (8) unless excepting such debt from discharge under this
> paragraph would impose an undue hardship on the debtor and
> the debtor's dependents, for –
>
>> (A)(i) an educational benefit overpayment or loan made,
>> insured, or guaranteed by a governmental unit, or made
>> under any program funded in whole or part by a
>> governmental unit or nonprofit institution; or
>>
>> (ii) an obligation to repay funds received as an educational
>> benefit, scholarship, or stipend; or

9

(B) any other education loan that is a qualified education
loan, as defined in section 221(d)(1) of the Internal
Revenue Code of 1986, incurred by a debtor who is an
individual . . . .

Id. (emphasis added); see also id. §1141(d)(2); id. §1228(a)(2); id. §1328(a)(2), (c).

A debtor seeking to discharge student loan debt falling within the purview of §523(a)(8)

assumes the burden of establishing that excepting that debt from discharge will cause the debtor

and his or her dependents "undue hardship."  See Faish, 72 F.3d at 305-06; In re Zierden-

Landmesser, 249 B.R. 65, 69 (Bankr. M.D. Pa. 2000).

In deciding adversary proceedings brought under §523(a)(8), courts have focused on the

purposes that motivated Congress to treat the discharge of student loan obligations differently

than other debts.  Said one court:

In enacting the undue hardship standard, Congress had to take into account
the viability of the student loan program.  That program serves valuable
purposes.  It affords individuals in all walks of life the opportunity to obtain
an education, and with it the mobility and financial stability that an education
can provide.  Indeed, without the program, many people would never receive
any higher education, because their credit risks would preclude them from
obtaining private commercial loans.[22]

In re Frushour, 433 F.3d 393, 399 (4th Cir. 2005) (citation omitted).

Congress intended §523(a)(8)'s heightened standard for obtaining a student loan

---

[22]        I am aware that the student loans at issue in this adversary did not fund the Debtor's own
education, but rather were incurred to fund her son and daughter's educations.  Nonetheless, some (but
not all) of the same general principles (i.e., regarding safeguarding a loan program that provides potential
students and their parents with assistance funding the costs of higher education) remain applicable.  See
also Faish, 72 F.3d at 302 ("[t]he Congressional intent to eliminate debtor abuse of the educational loan
program would apply both to single makers of loan notes and to co-makers, whether students or their
parents or other co-signers, as all may abuse the bankruptcy system or take advantage of legal
loopholes.") (citing In re Pelkowski, 990 F.2d 737, 744 (3d Cir. 1993)).

discharge to help ensure the financial integrity of the student loan program by protecting it from

fiscal doom.[23]  Frushour, 433 F.3d at 400.  Section 523(a)(8) is also said to help ensure "public

support for the [student loan] program by preventing debtors from easily discharging their debts

at the expense of the taxpayers who made possible their education."  Id. at 400; see also Faish, 72

F.3d at 306 (noting that the "undue hardship" standard "safeguards the financial integrity of the

student loan program by not permitting debtors who have obtained the substantial benefits of an

education funded by taxpayer dollars to dismiss their obligation simply because repayment of the

borrowed funds would require some major personal and financial sacrifices.").

In short, Congress enacted §523(a)(8) to foster "the twin goals of rescuing the student

loan program from fiscal doom and preventing abuse of the bankruptcy process by undeserving

debtors."  Pelkowksi, 990 F.2d at 743.[24]


**B.  The Test for "Undue Hardship"**

In this adversary proceeding, it is undisputed that the Debtor's student loans constitute the

---

[23]     But see, e.g. Rafael I. Pardo & Michelle R. Lacey, The Real Student-Loan Scandal:
Undue Hardship Discharge Litigation, 83 Am. Bankr. L. J. 179 (Winter 2009) (calling for reform of
student loan discharge public policy based on assertion that courts are applying inconsistent standards
and adding extraneous factors to the analysis that are unrelated to the financial indicia of the debtor's
ability to repay).

[24]     See also In re Nys, 446 F.3d 938, 944 (9th Cir. 2006) ("Congress sought to prohibit a
'garden-variety debtor' from discharging student loans, especially when that 'garden-variety debtor' will
presumably use [the] loan-funded education to substantially increase [his or] her income in the near
future"); Alan N. Resnick & Henry J. Sommer, eds., 4 Collier on Bankruptcy  ¶523.14[1] at 523-101 (15th
rev. ed. 2008) (hereinafter, "Collier on Bankruptcy") (noting that courts have cited two purposes to the
section 523(a)(8) exception to discharge:  (1) preventing abuse of the educational loan system and (2)
safeguarding the financial integrity of governmental entities and nonprofit institutions that participate in
student loan programs).

sorts of educational debt obligations that fall within the strictures of §523(a)(8).  Accordingly,

those loans are nondischargeable unless they "impose an <u>undue hardship</u> on the debtor and the

debtor's dependents."  11 U.S.C. §523(a)(8) (emphasis added).

The Bankruptcy Code does not define the "undue hardship" standard.  Nonetheless, as a

starting point, courts have reasoned that

> [b]ecause Congress selected the word "undue," the required hardship under
> §523(a)(8) must be more than the usual hardship that accompanies bankruptcy.
> Inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy
> litigants would have undue hardship.  The exception would swallow the rule, and
> Congress's restriction would be meaningless.  As a result, "[t]he existence of the
> adjective 'undue' indicates that Congress viewed garden-variety hardship as
> insufficient excuse for a discharge of student loans."  <u>Rifino v. United States (In re
> Rifino)</u>, 245 F.3d 1083, 1087 (9th Cir. 2001) (internal quotation marks
> omitted).

<u>Frushour</u>, 433 F.3d at 399.

As stated above, courts in the Third Circuit employ the three-part <u>Brunner</u> test for "undue

hardship" under §523(a)(8).  <u>See</u> <u>Faish</u>, 72 F.3d at 306.  The Court of Appeals has instructed that

this test provides "the definitive, exclusive authority that bankruptcy courts must utilize to

determine whether the 'undue hardship' exception applies."  <u>Id.</u> at 306.  In other words,

"[e]quitable concerns or other extraneous factors not contemplated by the <u>Brunner</u> framework

may not be imported into the court's analysis to support a finding of  dischargeability."  <u>Id.</u>

Under the first prong of <u>Brunner</u>, the court must examine "the debtor's current financial

condition to see if payment of the loans would cause his standard of living to fall below that

minimally necessary."  <u>Id.</u> at 305 (quoting <u>In re Roberson</u>, 999 F.2d 1132, 1135 (7th Cir. 1993)).

According to <u>Faish</u>, satisfying this prong "requires more than a showing of tight finances."  <u>Id.</u> at

306.

12

The second prong of the <u>Brunner</u> test requires the debtor to prove that there are additional circumstances that indicate that "this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." <u>Id.</u> at 305 (quoting <u>Brunner</u>, 831 F.2d at 396). To this end, the Court of Appeals has stated that a student loan may not be discharged based **<u>simply</u>** on a "present inability to fulfill [the] financial commitment." <u>In re Brightful</u>, 267 F.3d 324, 328 (3d Cir. 2001) (internal quotations omitted).

The third prong of <u>Brunner</u> requires an examination of the debtor's good faith. This inquiry "is to be guided by the understanding that undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." <u>Faish</u>, 72 F.3d at 305 (internal quotations and citation omitted).

The debtor bears the burden of establishing each element of the <u>Brunner</u> test by a preponderance of the evidence. <u>Brightful</u>, 267 F.3d at 327. All three elements must be satisfied individually before a discharge can be granted. If any one of the <u>Brunner</u> requirements is not satisfied, the bankruptcy court's inquiry must end there, with a finding of no dischargeability. <u>Faish</u>, 72 F.3d at 306.

## IV.  SUMMARY JUDGMENT STANDARD

The issue whether the Debtor's student loan obligation to Sallie Mae is dischargeable pursuant to §523(a)(8) currently arises, via the pending cross motions, in the summary judgment context.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted

13

when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[25]  The standard for evaluating a summary judgment motion is well established and has been stated in numerous written opinions in this district.  E.g., In re Klayman, 333 B.R. 695, 698-99 (Bankr. E.D. Pa. 2005) (per Raslavich, J.); In re LaCheen, 2005 WL 1155257, at *2 (Bankr. E.D. Pa. Apr. 28, 2005) (per Sigmund, J.); In re Lewis, 290 B.R. 541, 545 (Bankr. E.D. Pa. 2003) (per Carey, J.); In re Newman, 304 B.R. 188, 192-93 (Bankr. E.D. Pa. 2002) (per Fox, J.).

Before a motion for summary judgment may be granted, the court must find that the motion alleges facts that, if proven at trial, would require a directed verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  If the movant meets this initial burden, the responding party may not rest on his or her pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986).  Such evidence must be sufficient to support a factfinder's factual determination in favor of the nonmoving party.  Id. Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In considering the evidentiary matter submitted in support of and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine

---

[25]    Fed. R. Civ. P. 56 is applicable to this adversary proceeding by operation of Fed. R. Bankr. P. 7056.

14

whether there is a disputed, material fact for determination at trial.  <u>Anderson</u>, 477 U.S. at 247-

50.  A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable

factfinder could return a verdict for the non-moving party.  <u>Id.</u> at 248.  All reasonable inferences

must be drawn in favor of the nonmoving party and against the movant.  <u>U.S. v. 717 S.</u>

<u>Woodward St.,</u> 2 F.3d 529, 533 (3d Cir. 1993).

The parties' respective burdens of proof also play a role in determining the merits of a

summary judgment motion.

> [W]here the movant is the defendant, or the party without the burden of proof on the
> underlying claim, the movant still has the initial burden of showing the court the
> absence of a genuine issue of material fact, but . . . this does not require the movant to
> support the motion with affidavits or other materials that negated the opponent's claim.
> In contrast, where . . .  "the party moving for summary judgment is the plaintiff, or the
> party who bears the burden of proof at trial, the standard is more stringent."  <u>National</u>
> <u>State Bank v. Federal Reserve Bank</u>, 979 F.2d 1579, 1582 (3d Cir.1992).

<u>Newman</u>, 304 B.R. at 193 (quoting <u>Adams v. Consol. Rail Corp.</u>, 1994 WL 383633, *1-*2 (E.D.

Pa. July 22, 1994)).

Thus, with respect to the pending cross motions for summary judgment, for Sallie Mae to

prevail on its motion, it must demonstrate that material facts are not in dispute and there is an

absence of evidence to create a triable issue regarding at least one necessary element of the

Debtor's claim of undue hardship, or alternatively, that the Debtor will be unable to meet her

burden of proof on one or more elements of the <u>Brunner</u> test at trial.  The Debtor has a different

burden.  She must show that there are no material facts in dispute and that the evidence on each of

the three <u>Brunner</u> elements is so powerful that no reasonable factfinder would disbelieve it.  <u>See,</u>

<u>e.g.</u>, <u>Newman</u>, 304 B.R. at 194.

15

## V.  DISCUSSION

As explained below, I conclude that the Debtor has not come forward with sufficient evidence to raise a genuine issue for trial demonstrating that she cannot maintain a minimal standard of living if required to repay her Sallie Mae student loan, i.e., the first element of the Brunner test for "undue hardship".  Consequently, Sallie Mae is entitled to summary judgment.

### A.  The First Prong of the Brunner Test  – Generally

### 1.

Under the first prong of the Brunner test, the debtor is required to demonstrate that he or she will not be able to maintain a "minimal" standard of living if required to repay his or her student loans.  Faish, 72 F.3d at 306 (emphasis added).  One court has explained that

> [a] "minimal standard of living" is not a fixed measure, and the concept is not defined by bright lines.  The upper limits of a minimal standard of living generally allow for a debtor to purchase "the basic necessities, such as food, clothing, housing and medical treatment."  While it does not relegate a debtor to the depths of  "abject poverty, a minimal standard of living does not accommodate 'luxury type expenses.'"  After providing for his or her basic needs, a debtor may not use her . . . financial resources for discretionary expenditures in lieu of repaying student loan creditors.

In re Johnson, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2009) (internal citations omitted); accord In re Alston, 297 B.R. 410, 415 (Bankr. E.D. Pa. 2003) ("It is well established that maintaining a minimal standard of living does not mean that [a] [d]ebtor has to live at a poverty level to repay [a] student loan"); see also In re Ivory, 269 B.R. 890 (Bankr. N.D. Ala. 2001).  Given the absence of "bright lines," perhaps the best that can be said is that "a minimal standard of living lies somewhere between poverty and mere difficulty."  In re McLaney, 314 B.R. 228, 234 (Bankr. M.D.

16

Ala. 2004), aff'd as modified, 375 B.R. 666 (M.D. Ala. 2007).

In Ivory, the court opined that the following items constituted elements of a "minimal standard of living":

> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests.  In most climates it also must be heated and cooled.

> 2. People need basic utilities such as electricity, water, and natural gas.  People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer.  They need telephones to communicate.

> 3. People need food and personal hygiene products.  They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

> 4. People need vehicles to go to work, to go to stores, and to go to doctors.  They must have insurance for and the ability to buy tags for those vehicles.  They must pay for gasoline.  They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

> 5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise.  People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

> 6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

269 B.R. at 899.

I find the list set forth in Ivory a helpful starting point in assessing the contours of a minimal standard of living.[26]

---

[26]     While reference to the Ivory list is helpful in the minimal standard of living inquiry, courts should be careful not to apply it mechanically or inflexibly.  Rather, in appropriate circumstances, the court must be prepared to depart from the list based on its own experiences, common sense, knowledge of the surrounding area and culture, and assessment of the reasonableness of what debtor claims he or she needs.  In addition, what is minimal can and probably should change over time (e.g., with new technology driving down the costs of things that might have previously been cost prohibitive).

**2.**

"The essence of the minimal standard of living requirement of the <u>Brunner</u> Test is that a debtor, after providing for his or her basic needs, may not allocate any of his or her financial resources to the detriment of their student loan creditor(s)." <u>In re Mitcham</u>, 293 B.R. 138, 144 (Bankr. N.D. Ohio 2003).

Evaluating whether repayment of a student loan will prohibit a debtor from maintaining a minimal standard of living necessarily entails consideration of the debtor's household income and those expenses necessary to meet his or her basic needs. <u>E.g.</u>, <u>In re Grove</u>, 323 B.R. 216, 224 (Bankr. N.D. Ohio 2005); <u>In re Murphy</u>, 305 B.R. 780, 793 (Bankr. E.D. Va. 2004); <u>In re Hoyle</u>, 199 B.R. 518, 521-23 (Bankr. E.D. Pa. 1996). Expenditures in excess of a minimal standard of living may have to be reallocated to repayment of the outstanding student loan depending upon the particular circumstances involved.[27]

**B. The Millers' Income and Expenses**

**1. Income/Assets**

Starting with the income side of the equation, the Millers enjoy an annualized income of approximately $57,000.00 based on Mr. Miller's earned income, the Social Security benefits received by Mrs. Miller and the Millers' younger daughter and their average income tax refund.

---

[27] It is not possible to state hard and fast rules. For example, in certain circumstances, it may be appropriate to grant a discharge of student loan debt where the debtor is making sacrifices and spending less than a minimal amount in one expense area in order to spend somewhat more than the minimal amount in another expense area. Further, the amount of any expenditure deemed in excess of that necessary for a minimal standard of living must be compared to the amount required to repay the student loan. The present proceeding does not involve these issues.

18

See n.9 & accompanying text, supra. [28]

The Debtor urges that I consider only her income in assessing the first factor of the Brunner "undue hardship" test, and not the income of the Miller household as whole, because she alone is obligated on the Sallie Mae student loans.  Given the circumstances in this case, however, I conclude that Mr. Miller's income and the Social Security Disability income of the Debtors' daughter are relevant in assessing the Debtor's overall financial picture.

Under the first factor of the Brunner "undue hardship" test, the question is whether the Debtor can pay her student loans and still maintain a minimal lifestyle.  The answer to this question requires consideration of the Debtor's actual circumstances.  Where a household has established a practice of pooling resources to meet needs and expenses, those resources, needs and expenses are all highly relevant to analyzing whether adding repayment of student loans to the mix would cause the Debtor and her household to fall below a minimal standard of living.

Further, in analyzing the effect repaying the Sallie Mae student loan might have on the Debtor's standard of living, I find it entirely appropriate to consider the income of the Debtor's spouse -- someone who has a legal duty to provide for her support.  "Couples not only provide financial support to one another, but each partner has a legal obligation, enforceable between them, to support one another to the extent of individual capabilities."  In re White, 243 B.R. 498, 510 (Bankr. N.D. Ala. 1999); see also  23 Pa. Cons. Stat. Ann. §4321 (West 2009) (married persons are

---

[28]     In its Motion, Sallie Mae contends that, in addition to income and tax refunds, the Millers also possess certain exempt assets that may be liquidated to pay the Debtor's student loan obligation.  (See Sallie Mae Mem. in Support of Sallie Mae's Motion, at 16 n.6 (arguing that the Millers "own a whole life insurance policy worth $3,250, an IRA worth $33,546, a 401(k) retirement plan worth $5,916, and Scott Trade Mutual fund worth $598, totaling $43,309 in 'exempt' assets")).  Ultimately, however, consideration of any such assets is unnecessary to my disposition of the pending Motions.

liable for the support of each other according to their respective abilities and for the support of

their children who are unemancipated).

As the court observed in <u>White</u>, "the vast majority of the reported opinions in which the

dischargeability of a student loan debt owned by a married debtor was at issue, the courts have

considered the earnings of both the debtor and his or her spouse for the purpose of evaluating the

quality of the debtor's lifestyle."  243 B.R. at 509 (collecting cases); <u>accord</u> <u>In re Wistuba</u>, 2003

WL 23838129, at *4 (Bankr. D. Kan. Oct. 9, 2003).  I see no reason to depart from the majority

approach in the circumstances presented in this case.  <u>Cf.</u> <u>In re Halverson</u>, 401 B.R. 378 (Bankr. D.

Minn. 2009) (spouse's income not considered in case of second marriage of couple both over age

of sixty-five (65) who, consistent with their pre-marital intentions, kept their finances separate).


### 2. Expenses

Moving to the Debtors' household expenses, the Debtor reports average monthly expenses

of $4,094.54, excluding the student loan obligation to Sallie Mae.  This amounts to $205.54 over

the Millers' current monthly income.  However, the focus of the first prong of the <u>Brunner</u> test is

"not [on] the debtor's <u>actual</u> spending but rather [on] 'those expenses . . . <u>necessary</u> for the debtor

to meet his or her <u>basic</u> needs.'" <u>Grove</u>, 323 B.R. at 224 (emphasis added).


### a. Sallie Mae's challenge to the Debtor's expenses

The main thrust of Sallie Mae's challenge to the Debtor's monthly expenses involves the

Millers' Home.

First, Sallie Mae suggests that a house with five (5) bedrooms and three (3) baths is more

"home" than the Millers need and that it is not reasonably necessary to maintaining a minimal

standard of living.  Their older daughter, who is currently in college, presumably can be expected

to move out of the Home in the foreseeable future, as did the Debtors' son.  This would leave a

married couple and one (1) child living in a five (5) bedroom home.

Sallie Mae also contends that the Home is unreasonably costly.  In support of this

argument, Sallie Mae suggests that, in judging what might constitute a "reasonable" mortgage or

rental expense for the purposes of applying §523(a)(8), the court look to the Internal Revenue

Service's "Local Standards" as a reference point.  The Internal Revenue Service ("IRS") employs

various expense standards to evaluate the financial condition of delinquent taxpayers to determine,

for example, whether to initiate enforcement action, accept a taxpayer's offer in compromise or

enter into an instalment repayment plan with the taxpayer.  It publishes these standards in its

Financial Analysis Handbook, which is part of its Internal Revenue Manual ("the IRM").  See 4

I.R.M. Abr. & Ann. §5.15.1.1 (West 2009).  The IRM specifies three types of expenses:  National

Standards, Local Standards, and Other Expenses.  See Id. §5.15.1.7.

In 2005, Congress incorporated the IRS Standards into the "means testing" provisions

of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119

Stat. 23 (2005) ("BAPCPA").  Bankruptcy courts must apply the IRS Standards in some chapter 7

cases to determine whether there is a presumption that the filing of the case is an "abuse," see 11

U.S.C. §707(b)(2)(A)(ii)(I), and in some chapter 13 cases to determine whether the debtor's

proposed chapter 13 plan provides a sufficient distribution to unsecured creditors to warrant

confirmation of the plan, see id. §1325(b)(3); see generally Eugene R. Wedoff, Means Testing in

the New §707(b), 79 Am. Bankr. L.J. 231, 252-64 (2005).  The IRS Standards intended for use in

21

bankruptcy matters are made available on the United States Trustee's website.   See

http://www.usdoj.gov/ust.

In this case, the parties stipulated that the IRS Local Standard for Housing and Utilities and

Other Expenses for a family of four (4) living in Delaware County, Pennsylvania is $1,299.00.[29]

(Stipulated Facts ¶14).[30]  In comparison to that standard, the Millers spend $1,797.54 on mortgage

payments for the Home, or $498.54 over the IRS allowance.  Sallie Mae urges that the IRS

Standard suggests that the Debtors could secure cheaper housing and still maintain a minimal

standard of living, all while freeing up funds that may be used to pay the Debtor's student loans.

Sallie Mae also contends that the utilities, real estate taxes and upkeep associated with the

Home are unnecessarily high.  The parties have stipulated that the IRS Local Standard for Utilities

and Other Household Expenses (which include property taxes, interest, insurance, maintenance,

repairs, gas, electric, water, heating oil, garbage collection, telephone and cell phone usage) is

$681.00 a month.[31]  (Stipulated Facts ¶14).  In comparison, the Millers spend at least $1,049.00 a

---

[29]     The Debtor stipulated to the existence of certain IRS expense allowances, which Sallie
Mae relies upon as evidence of reasonable standards of expenses.  No other evidence was submitted with
respect to the issue of the actual costs of rents, mortgages or other expenses in Delaware County,
Pennsylvania.

[30]     While Sallie Mae stipulated to what the IRS Standards for a family of four (4) are, it is
nonetheless Sallie Mae's position that the Millers' 20-year-old daughter should be excluded from
consideration and that the Miller household is really a three (3) person household. Sallie Mae contends
that, while the Millers' 20-year-old daughter might be considered a "dependent" for the purposes of
repaying unpaid taxes to the IRS, she should not be considered a "dependent" or factored into the court's
consideration of the Millers' household size or expenses for the purposes of determining whether the
Millers can maintain a minimal standard of living .  I need not reach that issue in determining the cross
motions.

[31]     The IRS has clarified that these components are the expenses it considers as part of the
"utilities" expense allowance.  See 4 I.R.M. Abr. & Ann. §5.15.1.7, at 4.A.

month on these expenses, or $368.00 over the IRS' allowance.[32]

Assuming, arguendo, that the Millers are a family of four (4), Sallie Mae contends that the Debtor's total expenses associated with the Home (i.e., for mortgage/rent and utilities and other expenses) exceed the IRS' Standards by $866.54. Alternatively, should the Millers be viewed as a family of three (3), as Sallie Mae contends is more appropriate, the Debtors' expenses exceed the IRS Standards by an even greater amount, i.e., $950.54.[33] (See Sallie Mae Mem. in Opp to Debtor's Motion, at 5-6).

Moreover, together, the mortgage payments and utility/household expenses the Millers currently incur on the Home constitute over seventy percent (70%) of their monthly disposable income.[34] Sallie Mae argues that if the Millers were to sell the Home and move to a house in a size and cost category in line with their family size and what a minimal standard of living might bear, the Millers' total expenses associated with the Home could be reduced sufficiently (to become more in line with the IRS allowances) to permit the Debtor to afford her monthly student loan

---

[32]    As set forth above, the Millers spend $375.00 a month for real estate taxes, $90.00 for property insurance, $100.00 for water and sewage, $317.00 for electricity and heating oil, $50.00 for home maintenance, $71.05 for telephone and $45.95 for cable usage, for a total of $1,049.00.

[33]    Sallie Mae's calculation of the total IRS Standard allowance breaks down as follows: (a) Food, Clothing, and Other Items - $1,151.00; (b) Housing and Utilities - $1,758; (c) Operating Costs of one vehicle (Sallie Mae subtracts the other vehicle because it is driven exclusively by the Debtor's older daughter) - $235.00, for total allowable living expenses of $3,144.00. (See Sallie Mae's Mem. in Opp. to Debtor's Motion, at 5-6).

[34]    Not including any federal income tax refund to which the Millers might be entitled, the Miller household has an average monthly income of $3,889.00. In contrast, their expenses associated with the Home total $2,846.54 ($1,797.54 for mortgage payments and $1,049.00 for utilities and other household expenses), or seventy-three percent (73%) of their income.

payment of $122.68 and still meet the family's basic necessities.  In furtherance of its position,

Sallie Mae cites cases in which courts have considered the availability of lower cost housing

relevant to a §523(a)(8) determination.  See, e.g., Johnson, 400 B.R. at 173; Grove, 323 B.R. at

228.

Finally, Sallie Mae contends that the Home is more than the Millers can afford.  The record

supports that contention.  The Millers have struggled to meet the expenses associated with the

Home.  The Debtor submitted an unrebutted affidavit stating that, as of February of this year, the

Millers were already at least two months in arrears in making their sizable mortgage payments.

Additionally, the Millers liquidated an exempt joint mutual fund account worth approximately

$6,200.00 to afford real estate taxes on the Home.  (Stipulated Facts ¶15).  These facts lend force

to Sallie Mae's arguments concerning whether the Home may be considered an ongoing,

sustainable and affordable expense for the Millers, as well as to the issue whether living in a Home

of this size and expense is necessary for the Millers to maintain a "minimal" lifestyle.[35]


### b.  the Debtor's response

The Debtor contends that Sallie Mae's argument concerning the reasonableness of the

Millers' housing expenses is flawed in at least two essential respects.

First, the Debtor argues that the IRS Standards that Sallie Mae references "are only meant

---

[35]      As noted infra, these facts also raise questions concerning whether the current "state of
affairs" (i.e., continuation of housing and mortgage expenses at the current level) is likely to persist for a
significant portion of the repayment period for the student loans, i.e., are the financial realities such that
the Millers are likely to have to sell or lose the Home due to their difficulties in meeting its associated
expenses.  See Brunner factor 2.

for collection of IRS debts" and for use where incorporated by Congress as part of BAPCPA.  (See Debtor's Mem. in Opp. to Sallie Mae's Motion, at 2).  Because Congress never incorporated the IRS standard allowances into §523(a)(8), the Debtor argues, accordingly, that those standards should not be imported into the "undue hardship" analysis.

Second, the Debtor accuses Sallie Mae of engaging in selective use of the IRS Standards. Citing In re Albee, 338 B.R. 407 (Bankr. W.D. Mo. 2006) and In re Cline, 248 B.R. 347 (B.A.P. 8th Cir. 2000), the Debtor contends that "courts have ruled that lenders cannot rely on IRS guidelines only to show certain expenses over the guidelines and ignore those below the guidelines."  (See Debtor's Mem. in Opp. to Sallie Mae's Motion, at 2).  She argues that if the court considers the IRS Standards at all, it should consider how the Millers compare to those standards on all of the various expense components.[36]  The Debtor maintains that if the court considered all of the applicable  "acceptable national standards for allowable living expenses" for a family of her size, it

---

[36]     The Debtor's argument, that in evaluating an undue hardship issue, courts should focus on the totality of the debtor's budget (both income and expenses) and not place undue emphasis on any one (1) particular expense item is consistent with what one bankruptcy court recently observed with respect to §523(a)(8) considerations:

> By the Defendants' logic, a debtor living well below the poverty level would be denied a discharge if the debtor, by foregoing a reasonable level of expenditure on clothing, spent part of his income on what would be considered luxury items, for example, cable or going out to dinner. A debtor whose income is insufficient to meet a minimal standard of living, taking into account the level of expenditures necessary for that purpose, ought not be denied a discharge of student loan debts based on the creditor's finding some item of expenditure that could be deemed a non-necessity. The Brunner test ought not be turned in that fashion into a game of "gotcha" based on viewing certain expenditures in isolation, wearing blinders that disregard the debtor's needs in a global fashion.

In re Zook, 2009 WL 512436, at *9 (Bankr. D.D.C. Feb. 27, 2009); accord McLaney, 375 B.R. at 675 ("Furthermore, as a court examines a debtor's expense budget as a whole, it is appropriate for a court to take into account reasonably necessary items that are omitted . . . .") (citing cases).

would find that the Debtor's expenses are actually $683.48 <u>lower</u> than the level the IRS guidelines

would allow.[37]  Thus, according to the Debtor, although her mortgage and housing\utility expenses

may exceed the IRS Standards, she spends less on other allowable expenses, with the result being

that the sum of all the IRS expense allowances (even using the reduced mortgage and utility

allowance) exceeds her actual household expenses.  (<u>See</u> Debtor's Mem. in Opp. to Sallie Mae's

Motion, at 2; Debtor's Mem. in Support of Debtor's Motion, at 10).  The Debtor suggests that this

not only rebuts Sallie Mae's argument that she expends more on housing and utilities than is

necessary to maintain a minimal standard of living, but proves her case with respect to the first

prong of the <u>Brunner</u> test.

From here, the parties' arguments ultimately devolve into a battle of the IRS Standards and

a dispute concerning whether and how those standards may be applied in the current context.  For

example, Sallie Mae disputes the Debtor's assertion that the Millers' total level of spending falls

below the IRS Standards by challenging one of the Debtor's expense calculations.  Specifically,

Sallie Mae contends that the IRS guidelines accompanying the IRS Standards should apply here in

determining the appropriate level of vehicle ownership costs that the Debtor may claim.  Those

guidelines provide that, "[i]f a taxpayer has a car, but no car payments, only the operating costs

---

[37]    Using figures for a family of four (4), the Debtor calculates the applicable IRS standard
allowance as follows:

| | |
|---|---|
| National Standard for Food, Clothing and Other Items | $1,370.00 |
| Local Standards of Housing and Utilities | $1,960.00 |
| Local Standards for Transportation (2 vehicles) | $  978.00 |
| Operating Expenses for 2 vehicles | $  470.00 |
| **TOTAL** | **$ 4,778.00** |

(<u>See</u> Debtor's Mem. in Opp. to Sallie Mae's Motion, at 2; Debtor's Mem. in Support of Debtor's Motion,
at 10).

portion of the transportation standard is used to figure the allowable transportation expense." (See Ex. L to Debtor's Motion, at 5). Should the IRS guidelines concerning the application of the vehicle ownership costs apply in this case and context as Sallie Mae advocates, the Debtor would not be entitled to the $978.00 in vehicle ownership costs that she claims because the Millers own their cars outright. Subtracting $978.00 from the Debtor's proffered total brings the Debtor's IRS allowable expenses to $3,800.00, leaving the Debtor's stipulated expenses of $4,094.00, exceeding the IRS Standards by $294.00.[38]


## D.  The Use of the IRS Standards and Means Testing in §523(a)(8) Proceedings

The parties opposing positions regarding the relationship between the IRS Locals Standards and the Debtors' housing expenses raise an important, threshold question concerning the role, if any, that the IRS Standards and the bankruptcy means testing methodology used for above-median debtors in chapter 7 and chapter 13 cases should play in a §523(a)(8) determination. The Debtor argues that the IRS Standards should play no role in a §523(a)(8) analysis. If those standards are considered, however, then the Debtor asserts that the court should apply a sort of modified means testing, pursuant to which anything that might be considered a "reasonable expense" for the purposes of a confirmation analysis in a chapter 13 case would also be considered an expense necessary to maintaining a minimal standard of living for the purposes of the "undue hardship" analysis. Sallie Mae, in turn, emphasizes the comparison of the Debtor's actual expenses to the

---

[38]        Whether a debtor may rely on the IRS standard allowance for vehicle ownership costs if she owns her vehicle outright is an issue that "has divided courts across the nation with at least forty-three bankruptcy courts, four district courts and three bankruptcy appellate panels weighing in on the issue to date." See In re May, 390 B.R. 338, 342 (Bankr. S.D. Ohio 2008) (collecting cases).

IRS Standards, with the IRS Standards serving an exemplar for reasonableness.  Sallie Mae's

argument, taken to its outer limits may suggest that a mechanical application of the IRS Standards

should be outcome determinative in a §523(a)(8) proceeding.[39]

As explained below, I find neither parties' position fully satisfactory.

### 1.

Initially, to the extent the Debtor contends that the IRS Standards should not be <u>binding</u> in a

§523(a)(8) analysis, I agree.   As the court reasoned persuasively in <u>Albee</u>:

> [I]t is not clear . . .  that Congress intended that the courts be bound by . . . [the IRS]
> standards in assessing whether repayment of student loan debt would constitute an
> undue hardship.  Congress had the opportunity to indicate that if that was its intent in
> making the amendments to the Bankruptcy Code embodied in the Act.  For example, in
> amended § 707(b) Congress specifically mandated that the courts utilize the IRS
> National Standards, Local Standards and standards for Other Necessary Expenses to
> determine a debtor's appropriate expenses in assessing whether the debtor has sufficient
> disposable income that the filing of a Chapter 7 proceeding would constitute an abuse.
> 11 U.S.C. § 707(b)(2)(A)(ii).  In addition, Congress mandated that those same standards
> be utilized in assessing the disposable income of Chapter 13 debtors whose income is
> above the applicable median. 11 U.S.C. § 1325(b)(3).  The Act also includes an
> amendment to paragraph (8) of § 523(a), the governing provision here, which expands
> the types of indebtedness subject to the requirement that discharge may only be
> obtained upon a showing of undue hardship. 11 U.S.C. § 523(a)(8)(B).  Therefore,
> while Congress specifically required the courts to utilize the IRS standards in certain
> places and did make amendments to § 523(a)(8), it did not purport to require the courts
> to be bound by those standards in making the undue hardship determination.
> Accordingly, the Court does not consider itself bound by such standards in this context.

338 B.R. at 412.

Moving away from this general principle, however, to the extent the Debtor contends that

the IRS Standards may not be considered in a §523(a)(8) analysis at <u>all</u>, even as some evidence of a

---

[39]        I do not suggest that Sallie Mae actually makes this argument.

reasonable alternative expense for comparison with the Debtor's actual expenses, the Debtor goes too far.  I find no convincing reason or persuasive authority to cause me to reject the IRS Standards as a piece of evidence that may assist a court in assessing the reasonableness and necessity of a particular expense item.  In reaching this conclusion, I join a number of other courts that have found it appropriate to consider the IRS Standards as one piece of evidence in the §523(a)(8) Brunner analysis.[40]

In this case, Sallie Mae has offered the IRS Standards as evidence regarding the cost of housing for a family in Delaware County.  The Debtor was free to come forward with evidence to rebut Sallie Mae's proffer, e.g., evidence to suggest that reasonable housing costs in Delaware County are higher than the IRS Standard allowances might suggest, or that the Debtor and her family could not secure housing at a lower cost than they presently pay for their Home and still maintain a minimal standard of living.  The Debtor also could have presented other evidence to rebut Sallie Mae's contention that the Debtor is spending more on housing than is necessary to maintain a minimal standard of living  – such as evidence, if any exists, that any move to lower cost housing would be offset or even outweighed by an increase in other expenses (e.g., travel to

---

[40]    See, e.g., In re Howe, 319 B.R. 886, 893 (B.A.P. 9th Cir. 2005) ("a bankruptcy court may consider the IRS Standards as one piece of evidence in relation to its first prong analysis"); In re O'Hearn, 339 F.3d 559, 562 (7th Cir. 2003) (noting that IRS standard allowance for housing and utility was proffered by creditor and considered by bankruptcy court as some evidence of a reasonable housing expense for the debtor in the context of a §523(a)(8) analysis); In re Evans-Lambert, 2008 WL 1734123, at *5 & n.6 (Bankr. N.D. Ga. Mar. 25, 2008) (comparing IRS standard allowance for housing with debtor's mortgage expenses); In re Golczewski, 371 B.R. 392, 400 (Bankr. N.D. Iowa 2006) (comparing IRS allowance for food to debtor's claimed monthly expenses for food for his family); see also Jackson v. Educ. Credit Mgmt. Corp., 2004 WL 952882 (N.D. Ohio Apr. 30, 2004) (affirming bankruptcy court's decision to look at the IRS standard allowances for various living expenses to compute the debtor's likely expenses if she were to seek certain types of employment in the future); Ivory, 269 B.R. at 903-09 (relying on IRS Standard as but one of a number of objective standards).

29

Mr. Miller's place of employment).

Instead, the Debtor appears to suggest that she can satisfy the first prong of the <u>Brunner</u>

analysis by demonstrating that the Millers' expenses, as a whole, do not exceed the IRS' allowable

expenses, as a whole, under a modified form of the means test.[41]  This argument, which equates a

debtor's ability to pay unsecured creditors generally under the means test with the ability to repay a

student loan while maintaining a minimal standard of living finds some support in dicta in <u>Howe</u>.[42]

For two (2) reasons, however, I cannot accept the argument.

First, the rationale expressed by the <u>Albee</u> court (quoted above) with respect to the proper

role of the IRS Standards in §523(a)(8) proceedings is equally persuasive with reference to the

---

[41]    The primary "modifications" would be that, for §523(a)(8) purposes, the debtor would be bound by the IRS allowances for housing and utilities and automobile expenses, rather than the potentially higher allowances that are available when the monthly repayment amount on secured debt exceeds the IRS allowances.  <u>See</u> 11 U.S.C. §707(b)(2)(A)(iii); Official Form 22A (lines 20B, 23-24, 42).

[42]    In its analysis, the <u>Howe</u> court appeared to accept the premise that the allowances in the IRS Standards represent expenses necessary to maintain a minimal standard of living:

> We reject creditor's argument that the IRS Standards are useful only as establishing a ceiling on a debtor's expenses. Creditor states that the IRS Standards represent an average standard of living, not a minimal standard of living. This argument mischaracterizes the nature of the IRS Standards. The IRS Standards represent average expenditures only for certain categories of basic living expenses. The IRS Standards do not represent an average or middle class standard of living.

319 B.R. at 893.  This conclusion appears to have been based on the fact that the IRS itself considers its standards to represent the expense level

> <u>necessary</u> to provide for a taxpayer's and his or her family's health and welfare and/or production of income. The expenses must be reasonable. The total necessary expenses establish <u>the minimum a taxpayer and family needs to live</u>.

i.    319 B.R. at 890 (emphasis added) (citing IRM §5.15.1.7 (2004).  The language of §5.15.1.7 of the IRS Manual quoted in <u>Howe</u> has not been changed since 2005.

means test generally.  Had Congress intended the courts to rely exclusively on the means test (or

some variation) in §523(a)(8) proceedings, that intent would have been expressed in the statute.

Second, the Debtor's argument is inconsistent with the established body of law that holds

that a debtor has a heightened obligation to apply his or her income to the repayment of a student

loan before the loan may be discharged under §523(a)(8).  It would be incongruous to measure that

heightened obligation by the same test that is used to determine if a debtor can discharge

"ordinary" unsecured debt without repayment.  In this regard, the First Circuit Bankruptcy

Appellate Panel's pre-BAPCPA comments in In re Savage, 311 B.R. 835, 840 n. 7 (B.A.P. 1st Cir.

2004) regarding the differences between the §1325(b) chapter 13 requirement that a debtor devote

his or her disposable income to the repayment of debt and the §523(a)(8) undue hardship standard

has continuing vitality today:

> Although the problems [of disposable income testing or, today, means testing and
> undue hardship] are similar (ascertaining whether there are sufficient resources to fund
> payments), the objects . . .  (disposable income for plan confirmations vs. payment
> without undue hardship) differ.  Under §1325, a debtor is generally not required to alter
> reasonable lifestyle choices.  The same can be said of §707(b) analysis, which generally
> focuses on the availability of sufficient disposable income to fund a Chapter 13 plan.
>
> Under §523(a)(8), the debtor's lifestyle (particularly expenses) is subjected to more
> rigid scrutiny.  Courts differ on the degree of scrutiny applied, or more precisely, on
> how much hardship a debtor can be expected to bear before it becomes "undue."  But
> deference to a debtor's lifestyle choices is, to put it kindly, muted.  Eliminating some
> expenses that would be considered legitimate under §1325 might well be done without
> creating "undue" hardship.

Id. (internal citations omitted).[43]

---

[43]     Also, the means test methodology, as a whole, is rife with anomalies that may make it an
undependable means of assessing whether the debtor has satisfied the first prong of the Brunner "undue
hardship" test.  For example, substantial sources of income that might otherwise be available for
repayment of student loan debt may be excluded on the income side of the calculation, see 11 U.S.C.
§541(b)(7)(B); id. §101(10A)(B), and Congress has permitted unlimited deductions on the expense side

31

**2.**

These conclusions concerning means testing lead back to the starting point of this discussion.  The IRS expense standards (and means testing methodology) may be helpful in providing the court with a frame of reference for evaluating the debtor's expenses, but they cannot be determinative on the question whether the debtor's is living at, below or above a minimal standard of living.  As one court has stated, in §523(a)(8) proceedings, the court "must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [the] [d]ebtor's expenses are reasonable and necessary" to maintaining a minimal standard of living.  In re Douglas, 366 B.R. 241, 253 (Bankr. M.D. Ga. 2007).

**E.  The Sufficiency of the Debtor's Evidence With Respect to Brunner's First Factor**

**1.**

The parties submitted a detailed stipulation of facts in support of their respective summary judgment motions. The question is whether there are any disputed issues of material fact.  If not, summary judgment is appropriate.

As stated, the heart of Sallie Mae's argument concerning the Debtor's Home is that the Debtor has not offered evidence to establish (or at least create a disputed issue of material fact)

---

for secured debt, see id. §707(b)(2)(A)(iii).  Also, debtors with "below median" incomes are not subject to the IRS expense standards.  The IRS expense standards come into play when an individual debtor's "currently monthly income" exceeds the median family income of the applicable State for a family of the same number as the debtor.  See 11 U.S.C. §707(b)(7)(A)(i)-(iii); id. §1325(b)(3)(A)-(C).  The term "current monthly income" is a defined term of art.  See 11 U.S.C. §101(10A); In re Johnson, 400 B.R. 639, 642-43 (Bankr. N.D. Ill. 2009).

32

why she needs this house, with its attendant level of debt service, in order to maintain a minimal

standard of living.  I agree.

The seemingly unnecessarily large size of the Home, combined with evidence offered that

the Debtor's actual expenses exceed the IRS housing, utilities and other expenses allowances, by

an amount ($866.54) substantially in excess of the $122.68 student loan payment that the Debtor

seeks to discharge, placed a burden on the Debtor to rebut Sallie Mae's showing by introducing

evidence to demonstrate that, or create a triable issue concerning whether: (1), this particular home

is necessary for the Debtor to maintain a minimal standard of living, or (2) based on the actual

market conditions in her geographic area, downsizing her housing would not result in savings

sufficient to permit the Debtor to pay her student loan while maintaining a minimal standard of

living;[44] and (3) why continuing to incur the modest $122.68 student loan payment would cause the

Debtor to drop below the minimal standard of living., The Debtor did not do so.

The Debtor produced no evidence regarding actual housing alternatives.  Instead, she relied

on the legal argument that her sacrifices with respect to other living expenses justifies the

disproportionate housing expenses.  While I accept the proposition that there may be cases in

which a debtor can make such trade-offs and satisfy the first prong of the Brunner test, I am not

convinced that this is such a case.  Considering the level of the net income in the Debtor's

household (near or above $4,000.00 per month) and the relatively modest level of the monthly

student loan payment ($122.68), more than an abstract showing that the Millers' actual expenses

falls somewhat short of the total IRS expense allowances under the means test is necessary to

---

[44]   Cf. In re Williams, 301 B.R. 62, 73 (Bankr. N.D. Cal. 2003) (debtor testified that
alternative housing would cost the same or more than his current housing).

33

create a triable issue on the question whether excepting the student loan from discharge will impair

the Debtor's ability to maintain a minimal standard of living.

## 2.

Two other considerations – ones that also relate to prong 2 of the <u>Brunner</u> test – inform

my decision.

The evidence presented raises a serious question as to the Debtor's ability to retain the

Home.  The Millers expend an unusually high and burdensome percentage of their income on their

home.  Not surprisingly, they have had to liquidate substantial resources to maintain their real

estate tax payments (something they cannot continue to do indefinitely) and have been unable to

keep up with their mortgage payments, even after receiving the immediate relief from their

unsecured obligations that the bankruptcy automatic stay afforded them.  These circumstances

suggest that there is a substantial likelihood that they will not be able to retain the Home.  Current

indications are that they may need to find alternative housing in the near future before a significant

portion of the repayment period on the student loans passes.  This placed a burden on the Debtor to

present evidence to create a triable issue that the current state of affairs  (<u>i.e.,</u> their current level of

expenses) is likely to persist for a significant portion of the student loan's repayment period (<u>see</u>

<u>Brunner</u> test, factor two) [45] or that, even under an alternative state of affairs (<u>i.e.,</u> after a move to a

different house), the Debtor could not maintain a minimal standard of living if forced to repay her

---

[45]        There is presently nothing in the record regarding the term of the subject student loan.
However, considering the amount of the monthly payment ($122.68) and the total amount of the debt
($20,624.00), I infer that term is fifteen (15) years or more.

student loans.  The Debtor did neither.

Nor did the Debtor address a number of questions relating to the financial impact on the household of their adult daughter  – assuming <u>arguendo</u> that their expenditures on her behalf may be considered in the undue hardship analysis.[46]  How much do the Millers pay each month in total as result of her residence in the family home?  How much does their daughter earn from her employment?  Can she or does she make a contribution to the household from her earnings?  Is she likely to leave the household in the foreseeable future and, if so, what effect would that have on the Millers' financial situation?  All of these questions impact both the first and the second prongs of the <u>Brunner</u> test.  The absence of evidence on these questions contributes to my conclusion that the Debtor has not met her burden of proof to defeat summary judgment.


## VI.  CONCLUSION

Because the Debtor has not met her burden on summary judgment, Sallie Mae's motion for summary judgment will be granted and the Debtor's motion for summary judgment will be denied.  An order will be entered determining that the Debtor's student loan debt to Sallie Mae is nondischargeable under 11 U.S.C. §523(a)(8).

---

[46]     <u>Compare</u> <u>In re Carlson-Callow</u>, 2008 WL 2357012 (Bankr. D. Idaho June 6, 2008); <u>In re Logan</u>, 263 B.R. 796 (Bankr. W.D. Kan. 2000) <u>with</u> <u>Educational Credit Management Corp. v. Stanley</u>, 300 B.R. 813, 818 (N.D. Fla. 2003); <u>In re Bray</u>, 332 B.R. 186, 192-93 (Bankr. W.D. Mo. 2005); <u>In re Doe</u>, 325 B.R. 69, 74-75 (Bankr. S.D.N.Y. 2005).  <u>See generally</u> <u>In re Grove</u>, 323 B.R. at 228-29 (without reaching issue, articulating arguments for treating adult child as a dependent for purposes of §523(a)(8)).

**Date:**  __July 22, 2009__

_____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**